UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6312-CR-ROETTGER

MAGISTRATE JUDGE SNOW

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JERMAINE WILLIAMS,

    Defendant.

_____/

**NIGHT BOX FILED**
**MAY 2 9 2001**
CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

## DEFENDANT JERMAINE WILLIAM'S MOTION TO COMPEL PRODUCTION OF RELEVANT MATERIAL AND INFORMATION CONCERNING DNA ANALYSIS

Defendant, JERMAINE WILLIAMS, through counsel and pursuant to Fed. R. Crim. P. 16(a)(1)(C-E) and the authority cited in the incorporated memorandum of law, respectfully moves this Court to enter an order requiring the United States to provide the following information and materials, for the following reasons:

1. Mr. Williams is charged with serious felony charges that subject him to a lengthy sentence if convicted. The materials and information requested herein are directly relevant to the DNA testing which the government has completed. Thus far the government has only provided the results of the DNA testing and the curricula vitae of its expert witnesses.

2. Mr. Williams will challenge the admissibility of the State's DNA evidence and its alleged statistical results under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The materials and information requested herein are necessary in order for Mr. Smith to be able to effectively investigate and prepare for those challenges to the DNA evidence and prepare for the DNA evidence at trial. The Court has a considerable interest in seeing that Mr. Williams is able to do so, in the interests of reliable and fair hearings on those issues, and a reliable and fair trial.

3. These requests are intended to apply to all DNA tests which have been performed or

are currently being performed in the instant case. The request is ongoing. In the event that new materials responsive to this request are produced, discovered or otherwise come into the possession of the government or its agents, said materials should be provided to the accused in a timely manner. In the event that more than one laboratory handled or had custody of samples subjected to DNA testing in this case, including any laboratory which has handled or had custody of the samples subsequent to DNA testing, these requests should be addresses to each laboratory, including but not limited to crime laboratories, commercial DNA testing facilities and government DNA testing facilities.

4   For the purpose of this request the following terminology applies:

A.  A "photographic quality copy" (of an original Polaroid or other photograph) is defined as a photographic reproduction which is <u>indistinguishable</u> from the original Polaroid or photograph (not a photocopy).

B.  An "outbreak or incident of sample contamination" is defined as any instance in which a score-able type was obtained from a reagent blank or negative amplification control, or any instance in which a reference sample (that is a sample known to have originated from a single human individual) scored more than two alleles for a particular genetic system.

C.  A "multi-probe genotype" for a sample is defined as a record of all alleles observed for each probe or genetic system used in testing that sample.

D.  "False positive" is defined as an incident in which a test incorrectly produced an allele signal (dot, band or peak) due to contamination or cross hybridization.

E.  "False negative" is defined as an incident in which a test failed to produce an allele indication (dot, band or peak) when the allele was known to be present.

F.  "Blind" proficiency test is defined as a proficiency test in which to

samples were presented as simulated casework and the fact that the samples constituted a test of proficiency was concealed from the laboratory personnel responsible for testing, interpreting, reporting or reviewing the simulated case.

G.  "Open" proficiency test is defined as a proficiency test in which all, or some, of the laboratory personnel responsible for testing, interpreting, reporting or reviewing the DNA tests were aware, or were able to reasonable infer that the test constituted a test of proficiency.

H.  An "externally-administered proficiency test" is defined as a proficiency test conducted by outside institutions or provided by other reputable sources, which are appropriately designed for forensic DNA analysis.

I.  An "internally-administered proficiency test" is defined as a proficiency test in which a laboratory or agency tests itself.

5.  The following information and materials are requested:

A  **Scope of DNA tests:** Identify all DNA tests which were performed in this case, including, the type of DNA test and the name(s) and address(es) of the individual(s) responsible for performing the tests.

B.  **Crime scene investigation:** Provide copies of any guidelines, police department policies or procedures or other instructions provided to, or followed by, crime scene investigators in collecting, handling, shipping and processing of samples to be analyzed by DNA testing. These materials should include, but not be limited to, guidelines or instructions regarding any precautions to ensure sample integrity and minimize biological contamination for subsequent PCR testing

C.  **Sample handling instructions:** Provide copies of any guidelines, police department policies or procedures or other instructions followed by, or provided to, any laboratory, or government agency which handled any item of biological evidence pertaining to the instant case. These materials should include,

3

but not be limited to, guidelines or instructions regarding any precautions to ensure sample integrity and minimize biological contamination for subsequent PCR testing.

D. **Chain of custody:** Provide copies of all chain of custody documents for all items of evidence subjected to DNA testing in this case including documentation which indicates how the materials were stored (temperature and type of container) and the amount of evidence material which was consumed.

E. **Current disposition of evidence:** Provide documentation of the current disposition of biological evidence in this case, including description of the item of evidence, how the evidence is stored and the amount of material which remains.

F. **Laboratory Personnel:** Provide a current resume and job description for each person involved in conducting or reviewing the DNA testing performed in this case.

G. **Case files:** Provide a legible copy of the complete case file including all records of DNA testing in the instant case. Case files should be provided for all tests run at a DNA testing laboratory and any other laboratory which handled the samples either before or after they were tested by the DNA lab. These materials should include, but not be limited to:

g.1 **Reports:** All reports regarding DNA testing in this case.

g.2 **Photographs of test strips:** Photographic quality copies of all original photographs of immobilized test strips.

g.3 **Photographs of gels:** Photographic quality copies of all photographs of ethidium bromide stained gels or their equivalent if a DNA binding stain other than ethidium bromide was used. This should include, but not be limited to, product gels, yield gels, post restriction gels (if applicable) and analytical gels.

g.4 **Statistical calculations:** Legible copies of all statistical calculations,

4

including any produced using a "ceiling approach."

g.5 **Bench notes:** Legible copies of all laboratory notes and records.

g.6 **Imaging data:** Photographic quality copies of all computer analyses of case data

h.  **Documents relied upon in performing testing:** Provide legible copies of all documents which were followed or relied upon in executing, interpreting and reporting the DNA tests performed in the instant case. These materials should include, but not be limited to:

h.1 **SOP:** Standard operating protocols (SOP).

h.2 **Updates to SOP:** Any memos or addenda which relate to any modifications to the SOP which were implemented in testing the samples in this case.

h.3 **Methodology:** Any written instructions which were followed in order to execute the laboratory bench-work.

h.4 **Interpretation:** Any written instructions which were followed in making the determination that samples either matched or did not match, or in ascribing genetic types to the samples which were tested.

h.5 **Statistical manipulations:** Any written instructions which were followed in arriving at the reported statistical estimated for the frequency of occurrence of genetic characteristics.

h.6 **Frequency tables:** Any statistical tables or tabulated databases which were relied upon in arriving at said statistical estimates.

h.7 **Reporting of test results:** Any written instructions or guideline which were followed in writing the report.

h.8 **Manufacturer's instructions:** Any instructions provided by a manufacturer as part of a DNA testing kit used in this case.

i.  **Genetic Independence:** Provide copies of published or unpublished

5

studies that the laboratory relies upon to establish independence of the loci tested in the instant case. If no clear study of independence exists, please provide a clear statement as to the basis for assuming independence.

j. **Technical Manuals and User's Guides:** Provide copies of all technical manuals, user's guides and product inserts specifically related to commercial DNA testing kits used in the instant case. Provide technical manuals, product inserts and user's guides for Profiler+ and Cofiler. This request relates to versions of manual inserts and user's guides relevant to the time of testing in this case as well as those relevant in time to the construction of the databases(s). If one edition/version was used during database construction and another during testing in the instant case, indicate this clearly by marking documents on the face page with "database" or "instant case."

k. **Probe and Primer Sequences:** Provide nucleotide sequences of all PCR primers used in the instant case.

l. **Molecular Basis:** Provide copies of scientific literature describing the molecular basis of the genetic loci and PCR primers used in the instant case. If the literature is readily available in a university size science library, bibliographic references will suffice for such articles. Include copies of all articles that specifically address Profiler+ and Cofiler. To prevent unnecessary expenditure of time, literature references need not include monoplex STR references prior to 1998. Provide copies of published or unpublished studies that document determination of optimal conditions for the primers and probes used in the instant case.

m. **Computer Generated Data:** Provide the following:

m.1 **Paper Copies Image Files:** Provide paper copies of all original, unedited image files generated during STR testing in the instant case.

m.2 **Paper Copies Unedited Electropherograms:** Provide paper copies

6

of all original, unedited electropherograms generated during STR testing in the instant case.

m.3  **Paper Copies Edited Image Files:** Provide paper copies of all edited image files and electropherograms generated during STR testing in the instant case.

m.4  **Electronic Files:** Provide electronic files for all original and edited image files including graphic images, electropherograms and all other files generated during testing in the instant case.

n.  **Precautions against contamination:** Provide copies of all documents concerned with precautions utilized by the DNA lab to prevent and detect outbreaks or incidents of sample contamination using PCR-based DNA tests, including but not limited to: precautions taken in sample preparation, precautions taken in sample handling, the physical set-up and lay-out of the laboratory, controls to detect contamination and precautions taken to prevent product carry-over, the tracing of contamination should it occur, cleaning laboratory areas and equipment in the event of a contamination event.

o.  **Instances of laboratory contamination:** Provide copies of all documents pertaining to any outbreak(s) or incident(s) of contamination concerning PCR-based DNA tests at the DNA lab, and the corrective action(s) taken to trace, identify and rectify such incident(s).

p.  **Control strips:** Provide photographic quality copies of all controls strips run within five days of the testing done in the instant case.

q.  **Copies of databases:** Provide copies of all databases used in the instant case in a format such that the multi-probe genotype is given for each sample tested. If the databases have not been maintained such that complete multi-probe genotypes can be provided for samples included in said databases, provide copies of the databases in the format which most closely approximates to a complete multi-

7

probe genotype, and provide a simple statement indicating that complete multi-probe genotypes are not known. In the event you have in your possession, or have access to, records that would enable the reconstruction of complete multi-probe genotypes across genetic systems, provide copies of said records.

r.  **Statutorily created databases:** Concerning any database consisting of multi-probe genotypes of persons whose sample were contributed as required by state or federal statute as persons incarcerated or on probation or parole for a sexual offense: Provide the multi-probe genotype for all individuals in the database on diskette. Provide a clear statement as to statistical and spreadsheet programs used to list and analyze the data. If such programs are not generally available, please provide the program with documentation for loading and running the program(s).

s.  **Construction of databases:** Provide copies of all documents related to the source or origin of samples in databases used by the DNA lab in the instant case, including but not limited to: documents concerning the method by which samples were collected, the background or characteristics of individuals who were the source of the samples, the choice of populations and sub-populations to be sampled and the nature of the sampling procedure used to collect the samples. In the event that samples were obtained from an outside agency, identify the outside agency by institution name, contact person, address, phone number, and provide copies of all correspondence with that agency. In the event that a database compiled by an outside agency was used, identify the outside agency by institution name, contact person, address, phone number, and provide copies of all correspondence with that agency. Provide copies of all documents related to the extraction, amplification, quantization, hybridization, testing, scoring, typing, of all samples included in the database. Provide the opportunity to inspect the original database data. Provide the opportunity to view the original data for randomly selected samples at the laboratory

8

by allowing the random selection of a small percentage of the samples to insure representation of a cross-section of the data. The original data in this context refers to STR electropherograms and graphic images.

t.    **Statistical independence of markers:** Provide copies of any studies in your possession or control which investigate the statistical independence of the genetic marker systems which comprised any DNA-based test used in this case. These materials should include, but not be limited to, verification of "Hardy-Weinberg equilibrium," "linkage equilibrium" or any other test of the statistical independence of alleles. For published studies which are generally available in a university library a bibliography containing citations in standard format will be sufficient. For papers which are not currently generally available, provide a copy. In the event that said studies are not available, provide a simple statement indicating this fact. Materials should be provided for any study which pertains to the independence of alleles detected by PCR-based tests.

u.    **Accreditation:** Provide copies of all licenses or other certificates of accreditation held by each laboratory. This request should include, but not be limited to: accreditation by the American Society of Crime Laboratory Directors (ASCLD) Laboratory Accreditation Board in Forensic DNA testing and the College of American Pathologists (CAP).

v.    **Proficiency test programs:** Provide all documentation regarding the DNA lab's participation in proficiency testing programs including programs which were in place at the time the samples were tested in this case and those in place today. This information should indicate; (i) whether each proficiency test was internally-or externally-administered, (ii) whether each proficiency test was open or blind, (iii) whether samples were simulated crime scene samples or pure blood samples, (iv) the number of proficiency tests submitted to each analyst each year,

9

(v) the number of proficiency test samples in each test, and (vi) whether the method used to test proficiency test samples was <u>indistinguishable</u> from the method used to test forensic casework samples. In the event that the method used to test proficiency test samples differed <u>in any respect</u> from the method used to test forensic casework samples, please disclose said differences. For externally-administered proficiency tests please identify the agency responsible for administering the proficiency test ant provide a name, address and phone number for the appropriate contact person at that agency. This information should include any and all laboratory codes used by the testing laboratory during proficiency testing, and indicating the testing agencies and the dates for which the code was used.

w. **Means of calculating error rate:** Provide all documentation regarding the method the DNA laboratory uses to calculate the error rate for each DNA test performed in this case, including the rate of false positives and false negatives (for example, error rate calculated as a function of total number of proficiency test samples tested or error rate calculated as a function of total number of comparisons made). In the event that a laboratory has not adopted a method for calculating its error rates, provide a simple statement regarding the laboratory's policy concerning reporting its error rates in court testimony or otherwise.

x. **Error rates based on externally-administered blind proficiency tests:** Provide all documentation regarding each DNA lab's error rates for each DNA test performed in this case, including the rate of false positives and false negatives, based on participation in <u>externally-administered blind</u> proficiency tests. A statement that no errors have been made to date is not acceptable unless it is accompanied by disclosure of the total number of samples and sample comparisons upon which it as based. If the DNA lab has not determined its error rates for any test used in this case, provide a statement that the error rates based on externally-administered blind

10

proficiency tests are unknown. In the event that the DNA lab has not calculated the error rates for any DNA test used in this case, provide copies of all externally-administered blind proficiency data in the possession of the DNA lab necessary to calculate the error rates of these tests.

y. **Overall error rates based on proficiency tests:** Provide all documentation regarding each DNA lab's error rates for each DNA test performed in this case, including the rate of false positives and false negatives, based on <u>overall participation</u> in proficiency tests, including blind and open proficiency tests, both internally- and externally-administered. A statement that no errors have been made to date must be accompanied by disclosure of the total number of samples and the sample comparisons upon which it is based. If the DNA lab has not determined its overall error rated for any test used in this case, provide a statement that the overall error rates are unknown. In the event that the DNA lab has not calculated the overall error rates for any DNA test used in this case, provide copies of all proficiency data in the possession of the DNA lab necessary to calculate the overall error rates of these tests.

z. Photocopies of all reports submitted by the testing agency regarding the evidence tested unless already provided to Mr. Williams.

aa. Copies of all computations of population frequencies for the tests, typings or matches reported, whether manually or by computer.

bb. Copies of all data bases used for each locus to generate the population frequencies.

cc. Copies of all procedures followed in this case to ultimately generate results and the frequencies reported, including but not limited to, the alleles in any allele ladders or sizing ladders.

dd. All materials and information concerning the rules for identifying the

11

pattern of a sample tested for DNA.

ee. All materials and information concerning the matching rule for declaring whether to samples match.

ff. All materials and information concerning potential artifacts and the manner or method by which potential artifacts are identified, the conditions under which they are believed to occur, the controls implemented for detecting their occurrence and the steps taken when they occur.

gg. All materials and information concerning the amplification conditions under which PCR testing was conducted. This information should include, but not be limited to, information and materials concerning the amplification cycling program, the composition of the amplification mixture, and the amount and nature of the target DNA in the sample.

hh. All materials and information concerning any safeguards to ensure that differential amplification does not occur during PCR testing.

ii. All materials and information concerning any safeguards to ensure that factors do not inhibit amplification.

jj. Notes and documents showing total estimated amount of DNA for each sample per protocol.

kk. Test and documents showing calculations related to the determination of quantity of DNA.

ll. Test and documents showing calculations relevant to dilution of samples

mm. Lab notes for all samples pertaining to quantization.

nn. Thermal cycler calibration logs for time periods in this case during which testing was performed.

oo. Provide a clear statement as to the instrument calibration schedule for

12

the thermal cyclers and water baths used in the instant case. This information should include, but not be limited to, statements as to how often instruments are calibrated and with what reference measuring device. Provide complete copies of manufacturer's instructions and specifications that accompany each measuring device.

6. The following materials and information are also requested:

a. Concerning any products used in the course of any testing in this case, copies of all guides or protocols, instructions manuals, pamphlets or directions which were otherwise used in any manner in or concerning this case. *See* par. 8.8 above.

b. Provide all lab notes, bench notes, replicative quality copies of any photographs and X-Rays, and all documentation showing compliance with or deviation from the protocols for use of Perkin Elmer Quantiblot, Chelex extraction, Profiler+ and Cofiler processes and kits, and for any other testing kits or products used in this case, for the following:

**Extraction:**

1. preparation of reagents for extraction procedures. This includes extraction procedures on hair, whole blood, blood stains and swabs and any other extractions done in this case.

2. extraction procedures. This includes documentation, lab notes and bench notes for extraction procedures done on hairs, whole blood, blood stains and swabs and all other extraction procedures done in this case.

**Quantiblot.**

3. Use of the Quantiblot Human DNA quantization Kit or any other form of quantization. This includes but is not limited to: reagent preparation procedures for reagents prepared at the lab or for reagents supplied (when supplied, by whom, when and how, etc.), information regarding protocols, slot blotting/immobilization

13

of DNA, DNA hybridization, detection steps, results interpretation, and performance characteristics. This includes all materials used for interpretation of the quantiblots or other quantization procedure.

7. All of the information and material requested must be produced to the defense under the due process clauses of the United States Constitution. U.S. Const., amend. V; *see Kyles v. Whitley*, 514 U.S. 419 (1995); *Brady v. Maryland*, 373 U.S. 83 (1963). Indeed, information and material that sheds light on the reliability and credibility of a police investigation and that can be used to impeach that police investigation is appropriate information for the defense to have possession of. *See Brady v. Maryland, supra; Kyles v. Whitley, supra; Giglio v. United States*, 405 U.S. 150 (1972) *and United States v. Bagley*, 473 U.S. 667 (1985) (impeaching as well as exculpatory is favorable to the accused under *Brady* and constitutes *Brady* material). "The determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Dennis v. United States*, 384 U.S. 855, 875 (1966).

8. Denial of this discovery request would violate Mr. Williams' right to the effective assistance of counsel, right to due process, right to confrontation, right to cross-examination, right to trial by jury, and the right to compulsory process. U.S. Const., amends. V & VI.

9. To render effective assistance of counsel, an attorney must investigate his or her client's case. Defense counsel cannot adequately and effectively investigate Mr. Williams' case without the information and materials requested in this motion. Effective investigation is a necessity to, among other important constitutional rights, the effective and complete cross-examination of witnesses called to testify against an accused. "Effective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross examination or impeachment of adverse witnesses at trial or to conduct plea discussions effectively." *ABA Standards for Criminal Justice, Prosecution Function and Defense Function*, Standard 4-4.1 (2nd ed. 1986).

10. Concomitant with the right to an adequate and effective investigation, Mr. Williams

14

is guaranteed the right to confront and cross-examine witnesses who are called to testify against him. U.S. Const., amend. VI. The prosecution will call to the stand alleged experts in pretrial hearings on the admissibility of any DNA evidence. Defense counsel cannot adequately and effectively prepare to confront or cross-examine any such witnesses at these hearings or during the trial on this matter should any such testimony be deemed admissible without production of the materials and information requested in this motion. Production of the materials and information requested in this motion will enable Mr. Williams to impeach witnesses called by the prosecution against Mr. Williams and to expose to the factfinder facts from which the factfinder may appropriately draw inferences relating to the credibility and reliability of these witnesses. This is entirely acceptable, appropriate and constitutionally protected cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Davis v. Alaska*, 415 U.S. 308 (1974).

11.    Further, the disclosure and production of this material and information is required under Fed. R. Crim. P. 16. Rule 16 requires the government to produce to the defense any reports or statements of experts made in connection with the particular case, including but not limited to the results of scientific tests, experiments or comparisons as well as any books, papers, documents, photographs or tangible objects held in connection with the case.

12.    In addition, Rule 16 requires the government to produce to the defense any material or information which may tend to negate the guilt of the accused as to the offenses charged or would tend to reduce the punishment for any such offenses. *Brady v. Maryland, supra; Kyles v. Whitley, supra*; U.S. Const., amends. V & VI.

13.    The items requested are those needed by any competent expert hired to assist the defense in order to fully evaluate the evidence and claims of the prosecution witnesses as to the appropriateness, validity, accuracy and precision of any testing or conclusions.

14.    Mr. Williams moves for a hearing on this motion.

15.    Pursuant to Local Rule 88.9, the undersigned communicated with the prosecutor assigned to this case in a good faith effort to resolve this matter prior to the filing of this motion.

WHEREFORE, Defendant, JERMAINE WILLIAMS moves for production of all material and information concerning DNA analysis as delineated above.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
Daryl E. Wilcox
Assistant Federal Public Defender
Florida Bar No. 0838845
1 E. Broward Boulevard
Suite 1100
Fort Lauderdale, Florida 33301
(954) 356-7436 ext. 108
(954) 356-7556 (fax)

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed on this 30 day of May, 2001 to Thomas Lanigan, Esquire, United States Attorney's Office, 299 E. Broward Blvd., Fort Lauderdale, Florida 33301 and to Barry Wax, Esquire, 301 S. Biscayne Blvd., Suite 1950, Miami, Florida 33131.

_____
Daryl E. Wilcox

F:\WILCOX\Williams discovery demand2.wpd

16