tpl:MMP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6312-CR-ROETTGER
MAGISTRATE JUDGE SNOW

UNITED STATES OF AMERICA,        )
                                 )
                                 )
        Plaintiff,                )
                                 )
v.                               )
                                 )
JERMAINE WILLIAMS,               )
                                 )
        Defendant.               )
_____/

NIGHT BOX FILED
JAN 1 1 2002
CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney and files this Response In Opposition To Defendant's Motion to suppress statements and in support thereof states as follows:

### BACKGROUND

1. On October 20, 2000, at approximately 6:40 am, two Brinks armored car drivers, EISHAM RUIZ and FRANK GRANJA arrived at the Citibank Automatic teller machine (ATM) in the parking lot located at 2789 University Drive in Coral Springs, Fl. As the guards were entering the ATM to supply the machine with money belonging to Citibank, Inc. they were ambushed by two males. The



men drove up in a red Honda and armed with a 12 guage shotgun and a 9mm semiautomatic pistol shot without warning from the car. The shotgun blasts severely injured the guards in the back and neck area and knocked them to the ground. RUIZ , one of the guards, although seriously injured, was able to return fire. RUIZ fired his service revolver 6 times in the direction of the red Honda. After being shot at by the guard, the robbers panicked and sped away without obtaining any money.

    2. Both of the guards saw the robbers flee the scene of the assault in a red automobile. The guards did not know the number of robbers involved.

    3. One witness, who lives in the immediate area, reported that as he was preparing to go to work, he heard what he believed were three gunshots coming from the vicinity of the Citibank. This same witness then observed a red Honda Civic with dark tinted windows fleeing from the bank and traveling east on NW 28th Street. Another Citizen saw the guards lying on the bank parking lot pavement. There are recorded 911 Calls from these witnesses.

    4. At Approximately 7:00 am, a Coral Springs Police Officer located a Red 1983 Honda Civic, two blocks west from the shooting scene. Investigation determined that it was the vehicle used during the commission of the robbery, The car was left with the motor running and the doors ajar. Investigation determined that the car had been stolen in Coral Springs, Fl on October 12, 2000. The

vehicle had numerous blood stains and blood splatters throughout the vehicle. Located on the dashboard was what appeared to be a "dred" lock piece of black human hair braid with blood and skin attached laying on the dash board of the vehicle near the vin number. Also recovered from the vehicle were a Mossberg 12 gauge shot gun loaded with three live shells; three spent shells were found in the back seat and a 9mm semiautomatic pistol loaded with eight rounds with one round in the chamber. A spent 9mm shell were found on the ground at the scene of the shooting.

5. At approximately 7:55 am Westside Hospital Plantation, FL contacted the police and advised that they had a black male patient for treatment of a gunshot wound to the head. Witnesses advised that the man had been dropped off by a white female driving a black Honda The police arrived at the hospital and interviewed the patient, JERMAINE WILLIAMS, who advised that he had been driving on the SawGrass expressway that morning when he pulled over to the side of the road to urinate. WILLIAMS further advised that shortly after exiting his car he felt a hot burning sensation on his head area and realized that he must have been shot. William advised the hospital personnel that he drove to the hospital for treatment.

6. Coral Springs P.D. officers upon learning that WILLIAMS had been involved in a shooting recalled that WILLIAMS and an associate, LOWEN ESPINUEVA, had been arrested by the Coral

Springs Police Department on August 28, 2000 for aggravated Battery with a firearm when WILLIAMS pointed a pistol at an individual. A search of WILLIAMS' vehicle incident to arrest that day produced two bullet proof vests, two pairs of handcuffs and two canisters of mace.

    7. A check of the Coral Springs Police Department field inquiry records showed that on Friday, October 6, 2000 at 6:30 a.m. exactly two week before the armored car robbery, Williams was stopped by a Coral Spring Police Patrol Officer in the 2700 block of NW 92nd Avenue. Williams, was dressed in all black clothing, and advised the officer that he was walking from his girlfriend's Nikki Jones' house located at 9500 block of 29th Street, to his friend Lowen's house at the Royal Palm Towers. The address where Williams was stopped by the police is located directly behind the Citibank, 2789 University Drive, Coral springs, Florida. Investigation determined that ESPINUEVA does not live at the Royal Palm Towers. He lives at 11401 NW 43rd Street.

    8. Coral Springs Police Report # 00-12479, revealed that the pistol, which is described as a German made 9mm Makarov, serial number F8539 was reported stolen on October 2, 2000, from a vehicle parked at 11315 NW 44th Street, a few blocks away from ESPINUEVA's residence. this pistol was stolen during a vehicle burglary. The Shotgun was reported stolen in a home invasion along

with $6,000 in cash on July 2, 2000 in Margate, FL. Investigation disclosed that the victim in the home invasion robbery was a Nevin Graff, an acquaintance of ESPINUEVA.

9. ESPINUEVA and WILLIAMS hid the vehicle in the Royal Palm Towers apartment complex. This is the same complex where WILLIAMS claimed ESPINUEVA resided when WILLIAMS was stopped and interviewed by the CSPD on October 6, 2001. ESPINUEVA'S fingerprints were recovered from the shotgun used to shoot the guards. While inventorying the clothing, a Coral Springs Crime Scene Technician discovered a handcuff key in one of pockets of WILLIAMS' pants.

10. Additionally, the bloody dred lock found on the dash board in the red Honda matched the color, texture, length and style of the dred locks worn by WILLIAMS.

11. WILLIAMS' Silver Integra was towed to the FBI, Miami Field Division and secured. The FBI Evidence Response Team conducted a search of WILLIAMS' silver Integra. Investigating personnel discovered an envelope in a driver's door compartment containing a rough sketch of the Citibank banking facility and a Brink's truck. The words "Brinks", "ATM", "Drive thru teller" and "walk up ATM" all appear on this document. Moreover, the times 7:25 a.m., 7:28 a.m., and 7:30 a.m. are also handwritten on this document. WILLIAMS' fingerprints were found on this diagram. In addition to collecting this item of evidence, ERT also collected

numerous swabs of suspected blood evidence and a bottle of Simple Green cleaning solution, which ESPINUEVA had earlier admitted to using to clean the blood stains from the Honda Integra.

12. Nuclear DNA analysis of the blood recovered from the door handle, headliner and other areas of the stolen red Honda used as a getaway car as well as blood recovered from William's Honda was compared with a known blood sample obtained from WILLIAMS. Nuclear DNA comparison indicates that all the blood recovered was that of WILLIAMS.

13. Charles A. Peters, an FBI firearm experts will testify that compositional steel shot analysis conducted on the shot gun pellets recovered from the bodies of RUIZ and GRANJA nand the ATM area compared with the live shotgun shells found in the shot gun recovered in the red Honda indicate that they are consistent with coming from the same source.

14. Shot pattern analysis conducted by FBI examiner Douglas P. Murphy indicated that the firing distance of the shotgun was greater than 5 feet but less than 15 feet.

## MOTION TO SUPPRESS

The defendant now moves this court to suppress statements made to law enforcement officers during an interview conducted at the Coral Springs Police station on October 20, 2000 claiming that

the statements had been taken after his right to counsel had been invoked. This interview was conducted after Williams had been treated for a gunshot wound to the head. Williams voluntarily accompanied Coral Springs Detective Doug Williams and FBI S/A Scott Umphlat to the Coral Springs Police Department.

Detective Williams and S/A Umphlat advised Defendant Williams of his constitutional rights pursuant to a standard advise of rights form. See advise of rights form attached as government's exhibit 1.

During the interview the defendant made several admissions and offered an incredible explanation as to how he was injured, that the car involved was a Honda Civic when the investigators had only mentioned that it was a Honda) nand that he was going to work that morning.  See S/A Umphlat's FBI 302 Report of interview attached as government's exhibit 2.

### Memorandum of Law

To determine whether testimonial evidence provided by a defendant was voluntary, the reviewing court must determine in the totality of the circumstances, the police obtained the evidence by overbearing the will of the accused. Haynes v.Washington, 373 U.S. 503, 513-14 (1963).  Test for involuntariness is whether defendant's will is overborne or is the confession the product of

rational intellect and free will. In assessing the validity of a waiver, courts analyze the totality of the circumstances surrounding the interrogation. United States v. Moran, 475 U.S. at 421. Factors commonly considered by the reviewing court should include the suspect's intelligence and education, age, past contact with the criminal justice system and physical and mental condition. See Moore v. Dugger, 856 F.2d 129, 134-35 (11th Cir. 1988); United States v. Cruz Jimenez, 894 F.2d 1,8 (1st Cir. 1990). When evaluating the voluntariness of a confession, the reviewing court will also consider the explicitness of the waiver, if any language barriers exist, the time lapse between the reading of Miranda warnings and the actual questioning and confession. See United States v. Frankson, 83 F. 3d 79, 83 (4th Cir. 1996).

Applying the totality of the circumstances analysis to the facts at bar it is clear that the defendant was timely advised of his constitutional rights not once but several times. The first time was by Coral springs Detective Doug Williams and FBI S/A Scott Umphlet when he expressly waived his rights advised that he understood his rights and waived his rights and gave a detailed statement to the FBI. The defendant's assertion that he was not properly advised of his right by Detective Williams is not born out by the tape of the interview and the advise of rights form signed by the defendant.(See government exhibit 1 attached).

The subsequent times the defendant was re-advised of his rights are when the investigators continually acknowledged his right to counsel and ultimately ceased the interview when the Defendant invoked his right to counsel. The defendant's interview was recorded on video and audio tape. There is no credible evidence that the defendant was ever intimidated or physically abused by the police. In his motion, the defendant simply states that he made vague inquiries about having a lawyer such as "What if I had a lawyer" and "Is there a reason for me to have a lawyer present." It is well settled that if the Invocation of Miranda rights are ambiguous and/or equivocal, further questioning is permissible. See Davis v. United States, 512 U.S. 452, 458-59 (1994). When the defendant clearly invoked his constitutional rights the investigators were aware that any inculpatory statements from that moment forward could not be used against Williams. The investigators chose to continue the questioning due to the fact that a brutal attack had occurred and they believe an accomplice was still at large and the public safety necessitated continuing the interview. See United States v. Quarles , 467 U.S. 649,655-56 (1984). The government does not intend to introduce any statements made by the defendant after he invoked his Miranda rights. The defendant alleges that he invoked his Miranda rights and that all statements that he made should be suppressed. The government seeks

to introduce the statement made prior to the invocation. This court will have to make credibility choices based on the totality of the circumstances.

Wherefore, based on the above, it is respectfully submitted that this Honorable court deny the Defendant's motion to suppress statements and evidence.

WHEREFORE, based on the above it is respectfully submitted that the defendant's motion to suppress be denied.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
THOMAS P. LANIGAN
Assistant United States Attorney
Florida Bar #A550003
U.S. Courthouse/Federal Building
500 E. Broward Boulevard
Fort Lauderdale, Florida 33301
(954) 356-7255 ext. 3590

CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing was sent to the below named on this /4/ day of January, 2002.

Darryl Wilcox, AFPD
1 East Broward blvd.
Fort Lauderdale, FL
33301

*[signature]*
THOMAS P. LANIGAN
ASSISTANT UNITED STATES ATTORNEY



# CORAL SPRINGS POLICE DEPARTMENT
2801 Coral Springs Drive
Coral Springs, Florida 33065

## RIGHTS FORM

**GOVERNMENT EXHIBIT**
CASE NO. 00-6312-Cr-NCR
EXHIBIT NO. 1

CASE NUMBER: 00-13181   DATE: 10/20/2000

SUBJECT: Jermaus Wiliams

INTERVIEWING OFFICER: Det. Doug Williams

Before I ask you any questions, I want to advise you of your Rights under the law.

You have the right to remain silent.

Should you decide to talk to me, anything you say may be used against you in a court of law.

You have the right to talk to an attorney and have him here with you before we ask you any questions.

If you cannot afford an attorney one will be appointed for you before we ask you any questions.

If you decide to answer the questions now, without an attorney present, you still have the right to stop answering questions at any time until you talk to an attorney.

## WAIVER OF RIGHTS

I, Jermaus Williams, have read this statement of my Rights or have had it read to me and I understand what my Rights are. With these Rights in mind I am willing to answer questions without an attorney present. This waiver of Rights is signed of my own free will without any threats or promises having been made to me.

Signature: [signed]   Date/Time: 10-20-2000  10:45A

Officer's Signature: [signed]   I.D.# 143   Date/Time: 10/20/00 1045AM

Witness Signature: S/A   I.D.#   Date/Time: 10/20/00 1045A (If Applicable)

CSPD#053 (Revised 6/5/2000)

FD-302 (Rev. 10-6-95)

GOVERNMENT EXHIBIT

CASE NO. 00-6312-Cr-NCR

EXHIBIT NO. 2

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  10/23/2000

    On October 20, 2000, JERMAINE WILLIAMS, a black Jamaican male, Date of Birth: October 19, 1979, was interviewed at the Coral Springs Police Department. Present for the interview was Detective DOUGLAS R. WILLIAMS of the Coral Springs Police Department.

    JERMAINE WILLIAMS was advised of his MIRANDA Warning utilizing a Miranda Warning Form.

    Prior to being advised of his rights WILLIAMS related that he was not under the influence of any alcoholic beverages, narcotics, drugs or prescription medication. WILLIAMS related he spoke English and could read and write in English. WILLIAMS also related he graduated from DOUGLAS High School in Coral Springs, Florida. After graduation WILLIAMS attended a trade school. WILLIAMS stated he was currently employed by Integrated Homes working in pre-wiring installation.

    After being advised of his rights utilizing the MIRANDA Warning Form, WILLIAMS indicated he would speak to these investigators without having an attorney present. WILLIAMS read and signed the MIRANDA Warning Form.

    WILLIAMS was asked to explain how he received the gunshot wound to his head. WILLIAMS responded, "Seriously I don't know." WILLIAMS stated he was driving to pick up LOWENS' dad and KYLE for work when he realized he had to urinate. LOWEN was identified as LOWEN ESPINUEVA and his younger brother was identified as KYLE. Although he acknowledged he was only two minutes away from his destination he decided to pull off the side of the Sawgrass Expressway to urinate. WILLIAMS advised he walked down a gully and was urinating when he was suddenly shot in the head. WILLIAMS could not provide a feasible explanation as to how or why he was shot by a passing motorist while urinating in a gully.

    Although he was bleeding profusely from his head WILLIAMS decided to continue driving to LOWENS' house. After arriving at LOWENS' house WILLIAMS asked LOWEN for a glass of water. WILLIAMS did not notify 911 emergency services for either the police or for a medical unit to respond to LOWENS' residence. Instead LOWEN asked a neighbor (later identified as DANA SAMPSON) to drive them

---

Investigation on  10/20/00  at  Coral Springs, Florida

File # 192B-MM-96423                                Date dictated  10/23/00

by  SA B. SCOTT UMPHLET BSU
    DET. DOUGLAS R. WILLIAMS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

192B-MM-96423

Continuation of FD-302 of __JERMAINE WILLIAMS__ , On __10/20/00__ , Page __2__

to a hospital. WILLIAMS could not explain why they drove to Westside Regional Medical Center in Plantation, Florida which was approximately twenty five minutes away when Coral Springs Medical Center was approximately five minutes away. Eventually WILLIAMS stated he was not driving so therefore he could not dictate which hospital he was to be driven.

When asked what time of the morning he was shot WILLIAMS stated between 6:45 am and 7:00 am. Detective WILLIAMS explained this was the same time the two Brinks armored van guards were shot during the attempted armed robbery of the ATM machine. It was explained to WILLIAMS how unusual it was that he was shot down in a gully while urinating at the approximate time the two guards were shot. It was further explained to WILLIAMS that one of the guards (while on his back) discharged his handgun during the robbery attempt. It was explained to WILLIAMS that the angle of his wound was consistent with being shot from the ground upward, not standing down in a gully as he had earlier described. WILLIAMS could not provide an explanation for this discrepancy.

When asked if he had changed his shirt prior to being driven to the hospital, WILLIAMS adamantly stated he did not change his shirt. When asked why there was not any visible blood on his shirt like there was on his shoes and jeans WILLIAMS advised the nurse had poured a liquid on his head to clean his wound. The liquid must have inadvertently cleaned the blood off his shirt in the process. It was explained to WILLIAMS usually a towel is placed around the individual to prevent the patients clothing from receiving any additional staining.

When asked if he had any knowledge of LOWEN having any weapons prior to the attempted robbery of the ATM machine WILLIAMS advised LOWEN had informed him he had bought a .380 caliber handgun a month earlier. LOWEN had purchased the handgun off the street.

As the interview continued WILLIAMS stated he had not been in a Civic earlier in the morning. Detective WILLIAMS asked what Civic. WILLIAMS stated the one used in the robbery. Both investigators explained to WILLIAMS the vehicle in question had only been referred to as a red vehicle not a Civic. Both investigators observed WILLIAMS body language and demeanor indicate he realized he had just made a mistake by identifying the stolen vehicle as a Civic. When asked to explain how he knew it was a Civic WILLIAMS smiled and attempted to explain most cars stolen in

FD-302a (Rev. 10-6-95)

192B-MM-96423

Continuation of FD-302 of __JERMAINE WILLIAMS__ , On __10/20/00__ , Page __3__

Coral Springs are Hondas. Based on this theory WILLIAMS stated the stolen car must have been a Civic.

As the interview continued, WILLIAMS asked for an attorney. Both investigators acknowledged any confessional statements made by WILLIAMS after invoking his rights to counsel could not be used against him but continued to speak with WILLIAMS to ascertain any additional subject information due to the exigent circumstances of the investigation. At the time the investigating agencies were not certain how many subjects were involved. The interviewing officials were concerned if a third or fourth subject did exist he/she posed an immediate threat to the community and law enforcement due to the extremely violent nature of the criminal acts committed earlier in the morning. It should be noted that although WILLIAMS did not provide feasible explanations to the questions posed to him he did not admit his involvement in the criminals violations for which he was arrested.